IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  11-cv-03114-WYD

BETTY TRUELOVE,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

---

**ORDER**

---

THIS MATTER is before the Court on review of the Commissioner's decision that denied Plaintiff's claim for supplemental security income ["SSI"] payments under the Social Security Act ["the Act"].  For the reasons stated below, this case is reversed and remanded to the Commissioner for further fact finding.

I.    BACKGROUND

Plaintiff was born on July 20, 1962, and was 46 years old when her application was filed.  (Transcript ["Tr."] at 19, Finding 6.)  She was in "special education" in school and stopped attending school after the ninth grade.  (*Id*. 299.)  When she was 30 years old, Plaintiff enrolled in a General Equivalency Degree ["GED"] program but was unsuccessful in obtaining her GED.  (*Id*.)

In March 2009, Plaintiff protectively filed an application for SSI payments under Title XVI of the Act.  (Tr. 114-23).  Plaintiff alleged that she became disabled on July 1, 2005.  (*Id*. 100).  Her claim was denied at the initial determination stage.  (*Id*. 46-52).

Plaintiff requested a hearing, and a hearing was held by the Administrative Law Judge ["ALJ"] on May 31, 2011.  (Tr. 21-40.)  The ALJ issued a decision on July 1, 2011, in which he concluded that Plaintiff was not disabled under the Act.  (*Id.* 8-20.)

Specifically, the ALJ found at step one of the sequential evaluation required by law that Plaintiff had not engaged in substantial gainful activity since her application date of March 30, 2009.  (Tr. 10, Finding 1.)

At step two, the ALJ determined that Plaintiff had the following "severe" impairments:  degenerative disc disease of the cervical and lumbar spine; degenerative changes in the knees; cystic nodule and arthritis of the right wrist; obesity; dysthymia; and somatization disorder vs. pain disorder.  (Tr. 10, Finding 2).  He found that Plaintiff's learning disorder and borderline intellectual functioning were not medically determinable impairments because they were suspect diagnoses that were never confirmed.  (*Id.* 10).  The ALJ also found that Plaintiff's headaches, panic attacks, and GERD were not medically determinable impairments.  (*Id.* 11.)

At step three, the ALJ considered the listings, including Listing 1.00 ff. for orthopedic impairments and listings relevant to Plaintiff's mental health impairments, as well as the impact of Plaintiff's obesity.  (Tr. 11.)  He determined that Plaintiff's impairments, alone or in combination, did not meet or equal a listed impairment.  (*Id.*)

The ALJ then turned to Plaintiff's residual functional capacity ["RFC"].  He stated that he accepted the State agency psychological expert's opinion as to Plaintiff's mental impairments (Tr. 17-18), and found that Plaintiff has "moderate limitations in the ability to maintain attention and concentration for extended periods; moderate limitations in the

ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderate limitations in the ability to interact appropriately with the general public." (*Id.* 11, Finding 4.) The ALJ also found that Plaintiff retained the RFC to perform unskilled, light work (lifting 20 pounds occasionally, 10 pounds frequently), with postural and non-exertional limitations. (*Id.* 11-12). Applying that RFC at step four, the ALJ found that Plaintiff could not perform her past work as a fast food worker or light housekeeper. (*Id.* 19, Finding 5).

The ALJ then proceeded to step five. Based on vocational expert testimony, the ALJ found that Plaintiff could perform other work that existed in significant numbers in the national economy. (Tr. 19-20, Finding 9.) These jobs included Commercial Bakery Worker with 2779 jobs nationally and 16 jobs in Colorado, Call Out Operator with 11,600 jobs nationally and 185 in Colorado, and Surveillance System Monitor with 8,500 jobs nationally and 250 in Colorado. (*Id.* 20.) Accordingly, the ALJ found that Plaintiff was not disabled. (*Id.* Finding 10.)

Plaintiff requested review by the Appeals Council, which was denied in October 2011. (Tr. 1-4.) Plaintiff timely requested judicial review, and this appeal followed. Plaintiff alleges that the ALJ erred because he (1) failed to properly weigh the mental health opinion from examining psychologist Jose Vega, Ph.D., and failed to state the weight, if any, he awarded the opinion; (2) did not properly weigh Dr. Dilullo's opinion and the weight given by the ALJ is not supported by substantial evidence; (3) failed to state the specific RFC limitations on a function-by-function basis; (4) did not properly

assess the RFC or support it by substantial evidence; and (5) did not follow the correct legal standards in evaluating the number of jobs and did not support his step five finding by substantial evidence.

The Commissioner asserts in response that Plaintiff's arguments are without merit. He argues that the ALJ reasonably considered the entire record, reasonably assessed the weight given to Dr. Dilullo's and Dr. Vega's opinions, reasonably assessed Plaintiff's RFC, and his finding that a significant number of jobs exists in the national economy that Plaintiff could perform is supported by substantial evidence. Accordingly, the Commissioner requests that I affirm the ALJ's decision.

II. ANALYSIS

A. Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990). "It requires more than a scintilla of evidence but less than a preponderance of the evidence." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for

reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

    B.    <u>Whether Reversal of the ALJ's Decision is Appropriate</u>

        1.    <u>Whether the ALJ Erred in Evaluating the Medical Evidence</u>

            a.    <u>Dr. Vega</u>

I first address Plaintiff's argument that the ALJ failed to properly weigh the opinion of Dr. Vega, who examined Plaintiff in May 2011. (Tr. 470-77.) He prepared a five page report of his examination (*id.* 470-75), and also completed a form entitled Residual Functional Capacity Evaluation (Mental) (*id.* 476-77.) On the form, Dr. Vega noted his opinion as to Plaintiff's degree of limitation in each of the twenty work activities. (*Id.*) He opined marked to extreme limitations in seven categories and moderate to marked limitations in another eight categories. (*Id.*)

Dr. Vega's opinions supported limitations more substantial than those listed in the RFC by the ALJ. (*Compare* Tr. 476-77 and Tr 11, Finding 4.) For example, Dr. Vega found that Plaintiff had marked to extreme limitations in the ability to understand and remember detailed instructions as well as in six areas of sustained concentration and persistence. (*Id.*) He also found that Plaintiff had moderate to marked limitations in connection with all areas of social interaction and in three areas of adaptation, and found slight to moderate limitations in many other areas. (*Id.*) By contrast, the ALJ found moderate restrictions in the ability to maintain attention and concentration, to complete a normal workday and workweek, and in social functioning. (*Id.* 11, Finding 11.)

Dr. Vega noted signs and symptoms he observed that supported his opinion, which constitute specific medical findings. *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).  For example, he found that Plaintiff's "[a]ffect was blunted, with an underlying depressed and anxious mood" (Tr. 472), that she did not know about any current events other than "You can't find work", had "difficulty in initial encoding of information, as well as recall of information", and "difficulty in responding in an abstract fashion." (*Id.* 473.)  Dr. Vega's diagnostic impressions included "Dysthymic Disorder", "Requires differential diagnosis between Undifferentiated Somatoform Disorder vs. Pain Disorder Associated with both Psychological Factors and a General Medical Condition", "Suspect Learning Disorder, NOS", "Psychosocial and Environmental Problems"; "Suspect Borderline Intellectual Functioning"; and a GAF score of 50-55.  (*Id.* 474.)  He noted agreement with Dr. Madsen's finding that Plaintiff "would have difficulty in meeting demands from a regular work schedule. (*Id.* 474-75.)  Finally, he found that Plaintiff would have difficulty meeting demands from competitive employment, and that while she is in need of psychiatric evaluation and treatment, she is unable to afford that treatment.  (*Id.* 475.)

I agree with Plaintiff that the ALJ erred in not discussing Dr. Vega's findings and in not stating what weight he gave to such findings.  While the ALJ may have considered Dr. Vega's report, at least in passing (*see* Tr. 10, 15), the ALJ plainly did not state what weight he assigned to his opinion, if any.[1]  He also completely ignored the

---

[1] While the Commissioner asserts that the ALJ implicitly addressed the weight given to Dr. Vega's opinion, this is not sufficient.

mental RFC evaluation completed by Dr. Vega.  The law is clear that an ALJ is required to consider the opinions of all the medical providers and to provide specific, legitimate reasons if he rejects them.  *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).  In doing so, the ALJ must not selectively apply the evidence.  *See Hierstein v. Chater*, No. 96-6233, 1997 WL 158177, at 2* (10th Cir. April 2, 1997) (unpublished) (finding legal error when the ALJ chose "superficially favorable notations out of a five-year treatment record, downplaying the severity of a chronic mental impairment inherently varying with the vicissitudes of the patient's life", finding that "reflects the kind of misleading selective inquiry courts have decried on numerous occasions").  The ALJ must also consider a number of relevant factors set out in the regulations in deciding the weight to give a medical opinion.  20 C.F.R. § 416.927(d); *Carpenter v. Astrue*, 537 F.3d 1264, 1270 (10th Cir. 2008).

If the ALJ's RFC finding "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 1996 WL 374184, at *7 (July 2, 1996); *see also Carpenter*, 537 F.3d at 1269 (ALJ erred by failing to discuss all of the significantly probative evidence relevant to the plaintiff's mental impairments, discuss how he resolved the conflicts in this evidence, or discuss how he resolved the conflicts between his findings and the evidence).  Here, the ALJ's RFC conflicts with Dr. Vega's opinion, as it does not incorporate many of his findings and opinions and is less restrictive than Dr. Vega's findings.  Therefore, the ALJ was required to explain any difference between his RFC finding and Dr. Vega's medical opinion.  *Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996).  This is particularly

true since the opinions of Dr. Vega were supported by the consultative examination of psychologist Dr. Madsen whose opinions the ALJ purported to give partial weight to. (Tr. 17, 298-302.)

The Commissioner argues, however, that the ALJ's RFC is consistent with Dr. Vega's GAF score of 50-55, suggesting that Plaintiff had moderate to moderately severe symptoms. (Tr. 475).[2] By contrast, the Commissioner asserts that Dr. Vega's marked and extreme limitations are not consistent with GAF score he assigned and are not consistent with the other medical evidence. I first note that this is a post hoc rationalization that may not be considered by the Court. *See Carpenter*, 537 F.3d at 1267 ("'a post hoc rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance. . .'").

Second, this is a medical assessment that the Commissioner is not entitled to make. *Winfrey*, 92 F.3d at 1021-22 (the ALJ is not entitled to reject a doctor's opinions without adequate justification or to substitute his own medical judgment for that of mental health professionals). Dr. Vega opined to a range of limitations from slight/moderate up to marked/extreme. It is pure speculation for the ALJ to decide that a GAF score of 50-55 is not consistent with this range of limitations, especially given the

---

[2] "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Langley v. Barnhart*, 373 F.3d 1116, 1122 n. 3 (10th Cir. 2004). A GAF score between 51 and 60 indicates "'moderate symptoms,' such as a flat affect, or 'moderate difficulty in social or occupational functioning." *Wilson v. Astrue*, 602 F.3d 1136, 1142 n. 3 (10th Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 4th ed. ["DSM-IV"] 2000 at 34 ). A GAF score between 41 and 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job). *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at *3 (10th Cir. Dec. 8, 2004) (unpublished) (quoting DSM-IV 34).

fact that the ALJ's other findings–such as the fact that Plaintiff would have difficulty meeting demands from competitive employment–were consistent with the GAF score. *See Groberg v. Astrue*, No. 09-4203, 2011 WL 538870, at *5 (10th Cir. Feb. 17, 2011) (unpublished) (a GAF score of 50 "demonstrates that Groberg's mental impairments were serious and likely to have some effect on his ability to work"); *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at *3 (10th Cir. Dec. 8, 2004) (unpublished) (A GAF score of fifty or less suggests an inability to keep a job).[3] At the very least, the ALJ should have contacted Dr. Vega for clarification if he felt the record was unclear on this issue. *See Thomas v. Barnhart*, No. 04-7141, 2005 WL 2114163, at *3-4 (10th Cir. Sep. 2, 2005) (unpublished).

Finally, it is argued by the Commissioner that Dr. Vega's statement that Plaintiff would have "difficulty meeting the demands from competitive employment" (Tr. 475), is not a medical opinion, but a statement on an issue reserved to the Commissioner, citing among other things 20 C.F.R. § 416.927(e)(2) (statement by medical source that claimant is "unable to work" or is "disabled" not entitled to special significance). This opinion was, however, directly relevant to the GAF score given to Plaintiff by Dr. Vega as it explained that Plaintiff was impacted in an occupational setting. Moreover, the statement was made in the context of opinions about the nature and severity of Plaintiff's mental impairments and the prognosis for her condition and was thus a "medical opinion" that should have been considered by the ALJ. *Fuller v. Astrue*, No.

---

[3] Citation to these and other unpublished opinions in this Order are made because I find that they have persuasive value and will assist in the disposition of this case. *See* 10th Cir. R. 32.1(A).

10-2037-JWL, 2011 WL 209527, at *10-11 (10th Cir. Jan. 21, 2011) (unpublished) (a psychiatrist's opinion regarding disability "is, by definition, a medical opinion" and " may not be disregarded. . . 'the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record'") (quotation omitted). Accordingly, the ALJ erred in not properly considering Dr. Vega's statement that Plaintiff was unable to work.

Since the ALJ failed to properly weigh Dr. Vega's opinions as required by law, this case must be reversed for failure to apply the correct legal standard. *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988); *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). Also, since I am remanding this case to the Commissioner for the proper weighing of Dr. Vega's opinions, the other medical evidence regarding Plaintiff's mental impairments will also need to be reweighed–including Dr. Madsen's opinion as well as the state agency physician's opinion whose opinion the ALJ accepted as representative of Plaintiff's true RFC. I note, however, as to the state agency physician that her report was a check-the-box form with limited findings. Such evaluation forms standing alone, "unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence." *Frey*, 816 F.2d at 515.

      b. Dr. Dulillo

Plaintiff also argues that the ALJ failed to properly weigh the opinion of Dr. Dilullo regarding her physical RFC, even though he stated that he gave "great weight" to this opinion. (Tr. 17.) The ALJ found on that issue that Dr. Dilullo's conclusions "are somewhat consistent with the exertional restrictions provided by Dr. Campbell . . ., as

-10-

well as the evidence of tenderness at the right wrist, movement restrictions caused by obesity, and tenderness at the lower back and sacroiliac joints." (*Id.*)  I find that the ALJ's reasons for giving great weight to Dr. Dulillo's opinion are not legitimate or supported by substantial evidence.  See *Doyal*, 331 F.3d at 764.

First, while the ALJ found that Dr. Dulillo's opinions were "somewhat consistent" with the exertional restrictions provided by Dr. Campbell, he did not articulate what was "somewhat consistent" between Dr. Dilullo's opinion and Dr. Campbell's restrictions. Further, the ALJ did not articulate why "somewhat consistent" was sufficiently consistent to support giving Dr. Dilullo's opinion "great weight" or how "somewhat consistent" amounts to substantial evidence.[4]

More importantly, Dr. Dilullo's opinion does *not* appear to be consistent with Dr. Campbell's restrictions.  (*Compare* Tr. 295 to Tr. 241.)  Thus, Dr. Campbell's opinion does not provide substantial evidence to support Dr. Dulillo's opinion.  Dr. Dulillo opined that Plaintiff could: lift/carry 20 pounds occasionally, 10 pounds continuously; no limitations in standing, walking or sitting. (*Id.* 295.)  Dr. Campbell opined that Plaintiff could:  lift/carry 20 pounds for less than one hour per day, 10 pounds for less than 3 hours per day; standing/walking less than four hours per day; sitting no limitations. (*Id.* 241.)  The two opinions differ as to exertional limitations of lifting/carrying and standing/ walking.  This difference is significant, as Dr. Dilullo's conclusions equate to the light exertional level while Dr. Campbell's restrictions as to lifting/carrying and standing/

---

[4] Indeed, "somewhat" has been defined to mean "in some degree or measure" or "slightly". http://www.merriam-webster.com/dictionary.  Slightly has been defined as ""lacking in strength or substance", "FLIMSY", "FRAIL", "TRIVIAL"; small of its kind or in amount."  *Id.*

walking equate to the sedentary exertional level.[5]  Dr. Campbell's restrictions, if accepted, would eliminate one of the three occupations the ALJ found Plaintiff could perform–commercial bakery worker.  (See Tr. 20; DOT No. 524.687-022.)  This is also significant as the ALJ mistakenly thought that Dr. Campbell's opinions translated into the ability to perform light work.  (Tr. 16.)

I also find that the ALJ's other reasons for giving great weight to Dr. Dulillo's opinions are not supported by substantial evidence.  As to the tenderness of the right wrist, this may support Dr. Dilullo's right upper extremity restrictions, but is not a good reason to support his lift/carry and stand/walk limitations.  As to tenderness at the lower back/sacroiliac joints, the ALJ states no explanation as to why this supports Dr. Dilullo's lift/carry and stand/walk limitations.  This tenderness could also be said to be consistent with Dr. Campbell's lift/carry limitations that the ALJ did not adopt, particularly since Dr. Campbell noted tenderness at the "bilateral LS junctions".  (*Id.* 240.)  The same is true as to the movement restrictions caused by obesity.  The ALJ failed to articulate the specific restrictions he is referring to that are caused by the obesity, and failed to explain which limitations in Dr. Dilullo's opinion that these unknown restrictions support.

Finally, there is no indication in the record that the ALJ considered the factors in the regulations that he was required to consider in weighing Dr. Dulillo's opinions.  Accordingly, I find that on remand the ALJ should also reweigh Dr. Dulillo's opinions, giving valid reasons for his decision as to the weight he chooses to assign same.

---

[5] This is true despite the fact that Dr. Campbell stated that Plaintiff "would be physically capable of sedentary, possibly light work"  (Tr. 175.), based on the exertional levels prescribed by law.

On remand, the ALJ should take into account the fact that Dr. Dulillo did not appear to have access to the radiology report attached to his opinion, which noted significant degenerative changes to Plaintiff's lumbosacral spine. (Tr. 297).[6] Dr. Dulillo also did not factor in Plaintiff's knee condition. Additionally, the ALJ should take into account that Dr. Dilullo did not have access to the June 2010 MRIs of Plaintiff's lumbar spine and her right knee. (*Id.* 400-02.) No physician opined Plaintiff could lift/carry in the light range after the MRIs. Indeed, the only opinion rendered after the MRIs was that of Plaintiff's primary treatment provider Pam Isley, NP, who opined Plaintiff was limited to lifting just 10 pounds up to one-third of the day (occasionally). (*Id.* 345.) The ALJ himself stated he felt that the more recent imaging results would cause Plaintiff to be more restricted than indicated by Dr. Dulillo (*id.* 17), but then failed to state what additional restrictions were required. This should be addressed on remand.

    2.    <u>Whether the ALJ Erred in Assessing Plaintiff's RFC</u>

Since I am remanding this case for the ALJ to reweigh the medical evidence, this will also require that the RFC be reassessed. On remand, the ALJ should also conduct a function by function assessment of Plaintiff's limitations, which is required. *Lawton v. Barnhart*, 121 F. App'x 364, 374 (10th Cir. 2005) (unpublished) (quoting SSR 96-8p, 1996 WL 374184, at *3-4). The Tenth Circuit has held that an ALJ errs, as here, when he expresses the RFC in terms of an exertional categories and does not first the seven

---

[6] Dr. Dulillo's opinion is dated January 9, 2012. The radiology report was transcribed on January 12, 2010.

strength demands. *Alexander v. Barnhart*, No. 02-5046, 2003 WL 22087496, at *28 (10th Cir. Sep. 2, 2003) (unpublished).

Indeed, if the ALJ had first performed the function by function assessment, he may have realized that he misinterpreted Dr. Campbell's opinion as to lifting/carrying. Dr. Campbell opined Plaintiff could lift/carry ten pounds for less than three hours per day and twenty pounds for less than one hour per day (Tr. 241); however, the ALJ remarked that she had opined Plaintiff could lift and carry 20 pounds occasionally (translating into up to 2.6 hours per day) and 10 pounds frequently (up to 5.33 hours per workday).[7] (*Id.* 16.) A function-by-function analysis also would have required the ALJ to resolve the conflict between Dr. Campbell's and Dr. Dulillo's opinions as to Plaintiff's ability to lift/carry. Finally, the ALJ should include a narrative discussion describing how the evidence supports each conclusion, as well as why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Lawton*, 121 F. App'x at 374; SSR 96-8p, 1996 WL 374184, at *7.

I also find that the ALJ must on remand properly consider the Impaired Intellectual Function and Developmental Learning Disorder diagnosed by Dr. Madsen. The ALJ erred in ignoring these diagnoses, instead focusing on the fact that Dr. Vega diagnosed only *suspect* diagnoses of a learning disorder and borderline intellectual

---

[7] "Frequently" is defined as between 1/3 and 2/3 of an 8-hour workday, translating into approximately 5.33 hours. "Occasionally" is defined as up to 1/3 of an 8-hour workday, or 2.66 hours. U.S. Dep't of Labor, Employment & Training Admin., *Dictionary of Occupational Titles* (4th ed.1991) at 1013.

functioning which the ALJ said "were never confirmed and cannot be considered medically determinable impairments." (Tr. 11.) However, Dr. Madsen's diagnoses were confirmed, and supported Dr. Vega's "suspect" diagnoses. These diagnoses must be properly considered by the ALJ. *Salazar v. Barnhart*, 468 F.3d 615, 622 (10th Cir. 2006) (an ALJ must consider "all of the claimant's medically determinable impairments, singly and in combination.") These diagnoses may well impact the types of jobs Plaintiff can do.

For example, as pointed out in Plaintiff's Opening Brief, the occupations of Call Out Operator and Surveillance System Monitor both require a medium degree of aptitude ability found in the middle one-third percentile of the population. Plaintiff asserts that people diagnosed with Borderline Intellectual Functioning fall within the 11th-14th percentiles of the population. As such, a person with this diagnosis may not be able to perform those two jobs. Further, jobs have General Education Development ["GED"] requirements regarding reasoning, math and language levels which also must be taken into account in determining whether Plaintiff is able to perform work. Given Plaintiff's impaired intellectual functioning, she may not meet the GED levels required to perform the type of work found by the ALJ. If the evidence is inadequate to determine these issues, the ALJ must develop the record as to same. *See Carter v. Astrue*, 73 F.3d 1019, 1022 (10th Cir. 1996).

On remand, the ALJ must also ensure that the RFC correctly takes into account all of Plaintiff's mental impairments and the effect of them on her ability to work. "The determination of mental RFC is crucial to the evaluation of an individual's capacity to

engage in substantial gainful work activity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). Even moderate impairments can decrease a claimant's ability to work. *See Bowers v. Astrue*, No. 07-5114, 2008 WL 794853, at *3 (10th Cir. March 26, 2008) (unpublished); *Haga v. Astrue,* 482 F.3d 1205, 1208 (10th Cir. 2007); POMS 24510.063, , http://policy.ssa.gov/poms.nsf/lnx/0424510063. As noted by the Social Security Administration, "the mentally impaired may have difficulty meeting the requirements of even so called 'low stress' jobs." SSR 85-15, 1985 WL 56857, at *6. The ALJ should also determine whether Plaintiff can "'focus long enough to complete tasks in a timely fashion; and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder.'" *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994). Further, he should consider whether she can hold whatever job she finds for a significant period of time.'" *Id.* at 1442 (quotation omitted).

I also note for purposes of remand that the ALJ erred by discounting the "evidence of mental functional difficulties" on the basis that Plaintiff "did not seek any mental health services to help clarify her functioning over time." (Tr. 16.) The ALJ further found on this issue that "[h]er decision to avoid mental health treatment suggests she did not find her psychological symptoms to be particularly limiting." (*Id.*) These judgments by the ALJ "'do not carry the day and override . . .medical opinion[s]   . . . that [are] supported by the record.'" *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation omitted). Indeed, "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the

basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion. Id.* (emphasis in original).  Further, courts have noted when claimants failed to seek psychiatric treatment for their mental condition that "'it is a questionable practice to chastise one with a mental impairments for the exercise of poor judgment in seeking rehabilitation.'" *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen*, 874 F.3d 116, 1124 (6th Cir. 1989).  This seems particularly apposite in this case given that Plaintiff was diagnosed with impaired intellectual function.

      Finally as to the RFC, I direct the ALJ on remand to explain to the vocational expert ["VE"] what is meant by the term "moderate limitation", as it appears that the ALJ's definition may not have matched the VE's definition.  (Compare Tr. 19–the ALJ's finding that Plaintiff's mental health issues would interfere with her ability to perform the task occasionally", "for 10% of the workday, up to one-third of the workday") with 38-39–the VE's finding that a moderate limitation "means it still can be done").  Since the ALJ did not tell the VE that Plaintiff's mental impairments could interfere with the ability to perform certain tasks up to 1/3 of the workday, this may well mean that the hypothetical question given to the VE was inadequate.  *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1993) (testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Commissioner's decision).  It may also mean that the jobs the VE found Plaintiff could do would not be available.  For example, the VE noted that the Call-Out Operator position he found Plaintiff could do is done on the telephone while

talking to people virtually the whole day.  (*Id.* 39.)  If Plaintiff is moderately impaired in interacting with the public as defined by the ALJ, this may preclude this occupation.

### 3.     Whether the ALJ Erred at Step Five

The errors in the evaluation of medical opinion evidence and RFC also impact the step-five evaluation, which must be reassessed on remand after the evidence is properly weighed and evaluated.  On remand, the ALJ should also determine whether the jobs found to exist by the ALJ exist in significant numbers in the national economy.

### III.     CONCLUSION

Based upon the foregoing, I find that the ALJ did not properly weigh the medical evidence and that errors were made in the RFC assessment.  This will require that the ALJ redo the sequential evaluation required by law starting at step two.  Accordingly,   it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further fact finding as directed in this Order pursuant to sentence four in 42 U.S.C. § 405(g).

Dated March 22, 2013

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge